John Wrather and Nell Wrather, Husband and Wife v. Commissioner.
Wrather v. Commissioner
Docket No. 38267.
United States Tax Court
T.C. Memo 1955-104; 1955 Tax Ct. Memo LEXIS 235; 14 T.C.M. (CCH) 345; T.C.M. (RIA) 55104; 4 Oil & Gas Rep. 1075; April 26, 1955
Allen E. Pye, Esq., for the petitioners. John P. Higgins, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, J.: Respondent determined deficiencies in petitioners' income tax for 1948 and 1949 in the amounts of $112,715.34 and $72,404.66, respectively. The following issues are presented in this proceeding: (1) Was petitioners' gain from the sale of an oil payment in 1948 ordinary income or capital gain? (2) Were petitioners entitled to certain claimed bad debt deductions for 1948 and 1949? Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. John and Nell Wrather, husband and wife, were residents of Longview, Texas. They filed joint tax returns for 1948 and 1949 with the collector of internal revenue for the second district *236 of Texas. John Wrather will hereinafter be referred to as the petitioner. Issue I Facts. - During 1948 and 1949 petitioner, T. W. George, and F. B. Wimberly were partners in a business known as George & Wrather Drilling Company, hereinafter referred to as the partnership. In 1948, petitioner, George and Wimberly, as partners, held certain oil and gas lease assignments for tracts of land known as the Brown Lease and the Kieffer "A" Lease. Both leases were productive and had produced income for the partnership prior to 1948. By a conveyance dated June 19, 1948, the partners and their wives, as individuals and for the partnership, sold and conveyed to the Indiana Farm Bureau Cooperative Association, Inc., hereinafter referred to as the Cooperative, an oil payment in the amount of $130,000 to be paid out of 9/10ths of 7/24ths of 7/8ths of the oil produced and saved from the Brown Lease. In consideration for this oil payment assignment the Cooperative paid the partnership $125,000 in cash on or about the date of the assignment. By another conveyance dated June 19, 1948, the partners and their wives, as individuals and for the partnership, sold and conveyed to the Cooperative an *237 oil payment in the amount of $155,000, to be paid out of 9/10ths of 5/16ths of 7/8ths of all the oil produced and saved from the Kieffer "A" Lease. On August 16, 1948, the partners and their wives conveyed to the Cooperative another $12,500 oil payment out of the Kieffer "A" Lease. In consideration for these oil payments from the Kieffer "A" Lease, the Cooperative paid the partnership $162,500 cash on or about the date of the assignments. In June 1948 the Cooperative received its first proceeds attributable to the oil payments from both leases. By January 1952, the Cooperative had received $130,000 from the Brown Lease and by June 1953, $167,500 from the Kieffer "A" Lease. The reasonable pay-out time on the three interests was calculated at the time of the assignments to be from four to six years. Opinion. - In this first issue the questions of fact have been stipulated and the remaining question of law is whether petitioner's share of the gain from the sale of an oil payment is a capital gain or ordinary income. Petitioner reported the gain as capital gain but respondent determined it to be ordinary income. The decision in this case is controlled by the decisions in prior *238 cases involving the sale and exchange of oil payments. In , affd. , it was held that the grantor of an oil payment realized a taxable gain on the sale of an oil payment. The gain was based on the consideration received for the oil payment, but the court did not discuss the question of whether the gain was capital gain or ordinary income. In a later case, , the Court was required to decide whether the consideration received by Hawn in exchange for an oil payment constituted capital gain or ordinary income. The Court, following , held that Hawn's conveyance of an oil payment was a transfer of a capital asset, and the gain realized therefrom was taxable as capital gain. Similarly, it was held by the Court of Appeals, Fifth Circuit, in , where a taxpayer transferred oil payments in exchange for cash and notes, that the oil payments were capital assets. The gain was then held to be taxable as capital gain. Since the Hawn, Nordan and Caldwell cases have established that oil payments *239 should be treated as capital assets, and since we are unable to distinguish the oil payments in the present case from those in the Hawn, Nordan and Caldwell cases, we must find that the oil payments conveyed by petitioner to the Cooperative were capital assets. Further, since there is no dispute that the properties were held for more than six months, petitioner's gain is taxable as capital gain under section 117 of the 1939 Code. Issue II Facts. - In 1946 petitioner obtained from the So-Grape Company, an Illinois corporation, hereinafter referred to as the Illinois corporation, a franchise to manufacture and sell So-Grape, a soft drink, in the Houston, Texas, area. The name of the So-Grape Company and its product was later changed to the O-So-Grape Company. On or about October 31, 1946, petitioner secured a corporate charter from the Secretary of State of Texas for the O-So-Grape Company of Houston, hereinafter referred to as the Houston corporation. This corporation's capital stock was 1,000 shares of $1 par value common stock. The stock was fully subscribed and paid in. Petitioner acquired 998 shares and J. H. Walters and Ewing Adams a qualifying share each. The corporation began *240 manufacturing and selling soft drinks in 1947. From September 1946 to December 1948 petitioner advanced money on open account to the Houston corporation. In general, this money was used in the business to buy materials, equipment, and to meet operating expenses, but some $61,517.92 of these advances were used to promote and finance the organization of the Houston corporation. On December 31, 1948, petitioner's accounts receivable ledger reflected the sum of $173,817.52 as the amount owed by the Houston corporation. The Houston corporation accounted for these advances as accounts payable. On October 12, 1948, petitioner sold all of his stock in the Houston corporation to C. N. Jarrell for $998. Petitioner received a note from Jarrell payable on demand and bearing an annual interest of 6 per cent until paid. After Jarrell acquired petitioner's stock an audit of the Houston corporation's books showed that the corporation was heavily indebted to the petitioner. A proposed settlement was made whereby petitioner would discount the advances due him by the amount that the Houston corporation had suffered losses. The amount due petitioner as the result of this settlement would be $123,006.10. *241 The Houston corporation's board of directors agreed to this settlement and an installment note bearing interest was executed and delivered to petitioner. The note was secured by a chattel mortgage upon the personal property of the corporation and a deed of trust upon the corporation's real property. On December 31, 1948, $49,267.86 of petitioner's advances to the Houston corporation were written off by him as bad debts. After petitioner's sale of the Houston corporation's capital stock he continued to make advances to the corporation and through April 24, 1950, petitioner had advanced an additional $37,000 to the corporation and had received demand interest bearing notes for the advances. On or about August 19, 1947, petitioner secured a corporate charter for the O-So-Grape Bottling Company of San Antonio, Texas, hereinafter referred to as the San Antonio corporation. This business was also operated under a franchise from the Illinois corporation. The San Antonio corporation had 1,000 shares of $1 par value common stock. Petitioner held 998 shares and J. H. Walters and H. M. Harrington, Jr., each held a qualifying share. The San Antonio corporation began manufacturing and selling *242 soft drinks in 1947. From the period January 21, 1947, to December 31, 1948, petitioner advanced $159,635.41 on open account to the San Antonio corporation. Some $60,611.16 of these advances were issued to promote and finance the organization of the San Antonio corporation, and the balance was used for material, equipment, and operating expenses. These advances were carried on petitioner's books as accounts receivable from the San Antonio corporation while the San Antonio corporation accounted for the advances as accounts payable. On October 12, 1948, petitioner sold his stock in the San Antonio corporation to C. N. Jarrell for $998. Jarrell gave petitioner an interest bearing demand note. After this sale an audit indicated that the San Antonio corporation was heavily indebted to petitioner and a settlement agreement was entered into whereby petitioner would receive a promissory note for $108,330.45 from the corporation payable in installments and bearing interest. Like the settlement for the Houston corporation, a chattel mortgage and a deed of trust were executed to secure the note of the San Antonio corporation. On December 31, 1948, $45,782.47 of petitioner's advances were written *243 off on his books as a bad debt. Petitioner continued to make advances to the San Antonio corporation so that by August 29, 1949, he had advanced an additional $39,750 and had received in return interest bearing notes for that amount. Petitioner's books carried these advances as notes receivable. In September 1949 petitioner foreclose on the mortgages and deeds of trust securing the notes of the San Antonio corporation. He purchased the property for $40,000 at a public auction held on the court house steps at San Antonio. In petitioner's 1948 return he claimed a bad debt deduction of $111,805.76. This deduction included the advances to the two corporations ($49,267.86 and $45,782.47) which petitioner had written off as bad debts. On his 1949 return he claimed a loss deduction of $109,230.67; this deduction was computed as follows: "Total advances to San
Antonio corporation
through August 1949
$195,013.14
Amount charged off as a
bad debt in 1948
45,782.47
$149,230.67
Received through fore-
closure sale
40,000.00
Net loss claimed in 1949
$109,230.67"
Opinion. - In the second issue respondent contends that petitioner is not entitled to bad debt deductions *244 for the advances made to the San Antonio corporation and the Houston corporation in 1948 and 1949. Respondent bases his determination on alternate grounds. His principal contention is that the advances to thinly capitalized corporations constituted additional capital contributions rather than bona fide loans. As a first alternative, if the advances constituted loans, respondent contends that the loans did not become worthless in 1948 or 1949. In the second alternative, if the loans became worthless in 1948 or 1949, respondent contends that the losses were non-business bad debts. On brief petitioner admits that the capitalization of the Houston corporation was $61,517.92 and that of the San Antonio corporation $60,611.16, not including the $1,000 of capital stock issued for each. Petitioner also relinquishes claim to the deductibility of any bad debts in 1948. The remaining question before us is narrowed to the deductibility of certain obligations of the San Antonio corporation in 1949. Petitioner claims that certain advances resulted in a bad debt loss incurred in connection with his trade or business of loaning money to various enterprises. Petitioner now computes his claimed bad *245 debt loss as follows: "Total advances to the
Antonio corporation
$195,013.14
Less: value of property
purchased at foreclos-
ure
40,000.00
$155,013.14
Less: petitioner's capital
investment in corpora-
tion
60,611.16
Net deductible bad debt
loss
$ 94,401.98"
In view of petitioner's concession on brief, the critical element in this proceeding is the existence of a debtor-creditor relationship between the petitioner and the San Antonio corporation in 1949. For this year there can be no doubt that a debtor-creditor relationship did exist between petitioner and the San Antonio corporation. The evidence overwhelmingly supports this conclusion. First, the fact that the San Antonio corporation, at a time when petitioner was not an interested stockholder, recognized its obligation to him, and issued interest bearing notes for his advances. Next, the corporation's property was foreclosed and sold at public auction when it failed to pay its notes. This foreclosure sale was based on a debtor-creditor relationship, and we now must recognize that this relationship existed in 1949. See Regulations 111, section 29.23(k)-3, and Regulations 118, section 39.23(k)-3. *246 The question, as to the amount of the alleged bad debt, is resolved by petitioner's concession on brief. In the 1949 return petitioner claimed, for the San Antonio corporation, a loss of $109,230.67; now petitioner claims a bad debt deduction of $94,401.98. Once we have recognized the debtorcreditor relationship, two other issues require consideration. One is whether the debt resulted from business or non-business transactions, and the other is whether the claimed bad debt was in fact worthless. We first discuss the business or nonbusiness aspect. Without dispute it is recognized that petitioner was in the oil business; he was a producer, driller, and an investor in oil interests. However, he contends that the bad debt was incurred in the business of promoting, financing and making loans to business enterprises. See ,. Respondent objects to this contention and argues if a debt existed at all, it was a non-business debt and deductible under section 23(k)(1) of the 1939 Code. Under this section of the Code, if a non-business bad debt becomes worthless during the taxable year it shall be treated as a short-term loss from a sale or exchange. *247 Petitioner has offered evidence in support of his allegation that he was in the business of financing various enterprises. This evidence described the activities and growth of the petitioner as a business man; it detailed petitioner's activities in the late twenties. Then, he was a salaried employee of his father; he constructed refineries and drilled for oil and gas. In the late thirties, while an employee of a refining company, he furnished approximately $1,000 to another man so that a fuel truck could be purchased. Even though petitioner got some profit out of this trucking venture, it was unsuccessful. Around 1934 petitioner furnished money for a newly formed partnership, the Wimberly & Wrather Drilling Company, to buy a drilling rig. Petitioner also supplied the current operating funds for this partnership, but he was not certain of the amounts advanced. Interest was not paid on these advances. Some time around 1940 petitioner and another entered a cattle grazing venture. Petitioner supplied the money but the venture proved unsuccessful. Petitioner's next venture, also around 1940, was another drilling partnership, the George & Wrather Production Company. Petitioner testified *248 that he advanced some $130,000 to this business, but the period of time and the terms of these advances are not in the record. It should be pointed out that while petitioner was interested in these various drilling partnerships, he also, in his own right, traded and developed oil leases. Some time later, the George & Wrather Production Company, a partnership, became the George & Wrather Drilling Company. Wimberly was also a partner but his name was not included in the partnership name. Petitioner advanced much of the money required for this partnership. Again there is no specific evidence as to the time or type of these advances. In 1947 or 1948 petitioner entered into a partnership which was called Wrather, Penn and Walters. This firm bought, sold and traded oil interests. Again petitioner supplied the money for this enterprise. About this same time petitioner became interested in the two soft drink companies that are involved in the present case. The entire history of petitioner's business activities indicates that he was interested in various business adventures as an investor and as an active manager. His business activities were generally related to those in the oil and *249 gas industry and his business associates always came from the same small group of men. In general, each venture grew out of a prior partnership; each had a life span, and each gave birth to a new partnership. This is not the history of a taxpayer in the trade or business of financing various enterprises, but rather it is the history of a man investing and managing in his own businesses. In , this type of activity was found not to constitute a trade or business. On this record we must find that petitioner was not in the trade or business of financing enterprises. Not only has petitioner failed to prove that he was generally in the trade or business of financing enterprises, but he has failed to specifically prove that this was his business in the year he claimed the deduction. See ; . Therefore, the debt resulting from the transactions with the San Antonio corporation was a non-business bad debt. The remaining alternate contention to be discussed is whether the debt was worthless in 1949. Frequently, in a closely held corporation a creditor-stockholder *250 claims a bad debt deduction to improve the corporation's capital structure. The claimed deduction is taken before the corporation is pushed to the wall of complete insolvency. However, in this case we have an entirely different situation. In 1949 petitioner was not an interested stockholder. His debtor was foreclosed and the corporate property was sold at public auction. All the debtor's assets were liquidated, and petitioner was still unpaid. There were no other assets or resources that petitioner could look to for payment. We can only conclude that petitioner's debt was worthless in 1949 and he is entitled to the deduction. Decision will be entered under Rule 50.